## AS TO AMOUNT OF COMMISSION DUE FOR SECURING FUNDS FOR A CONTRACTOR.

Circuit Court of Cuyahoga County.

HARRY E. HAYES v. WALTER ALEXANDER ET AL.*

Decided, January 26, 1903.

*Contracts—No Contract Obligation where Promisee has Option to Extend Operation of Original Contract.*

Where a proposal is made to plaintiff that if he will procure $80,000 for a contractor to be used by him in the completion of a certain part of his contract, a certain commission will be paid to plaintiff, and for any amount secured or guaranteed in excess of $80,000 for the completion of the entire contract a like commission will be paid, plaintiff having procured the $80,000 and received his commission thereon, is under no legal obligation to furnish or guarantee funds for the completion of the contract, and has no lien upon bonds issued by the company for which the contractor is working and placed in trust to secure the payment of funds advanced or guaranteed to the contractor, nor any right of action against the company for wrongfully forfeiting the contract with the contractor.

*Blandin, Rice & Ginn,* for plaintiff.

*Hoyt, Dustin & Kelley* and *Kline, Carr, Tolles & Goff,* contra.

CALDWELL, J.; HALE, J., and MARVIN, J., concur.

This action was brought in the court of common pleas on July 22, 1901.

The petition sets up two promissory notes; one dated July 20th, 1901, for the sum of $550, signed by Walter Alexander and given to the plaintiff; the other note dated May 20th, 1901, for $26,635 made and delivered by Walter Alexander to W. J. Hayes .& Sons, and sets forth certain bonds, five hundred in number, of $1,000 each, made by the Mississippi Valley Transit Company to the defendant, the Interurban Construction Company, which the Interurban Construction Company under the authority of the Mississippi Valley Transit Company turned

*Affirmed without opinion, *Hayes* v. *Alexander et al,* 71 Ohio State, 534.

over to Walter Alexander for the purpose of being pledged as security for these notes.

The petition avers that these notes are due and unpaid, and that the bonds are pledged for the security of the same, and the plaintiff asks the court to take an account of the amount due the plaintiff upon these notes and find that the bonds were pledged in payment of the same, and order said bonds to be sold in their entirety and that the plaintiff be paid the amount so found due him out of the amount realized and the balance turned over according to the rights of the other parties to the action.

On October 14th, 1901, an amendment was filed to the petition, in which it is averred that on the 1st day of February, 1901, the defendant, Walter Alexander, entered into a contract in writing with the defendant, the Inter-Urban Construction Company, by which Alexander undertook and agreed to continue and complete the construction and equipment of an electric railway for the defendant, the Mississippi Valley Transit Company, from a point in or near the city of East St. Louis in the state of Illinois, to and through the city of Collinsville, and thence to and through the city of Edwardsville, both in the state of Illinois. And by further averments it is stated that the Inter-Urban Construction Company was to pay Walter Alexander the entire cost of such construction and equipment and, in addition thereto, a further sum equal to 15% of such cost, which sum of 15% upon said actual cost was to constitute and be the compensation of said Walter Alexander for his services and work in the premises. That to enable Alexander to procure the money and means with which to carry on and complete said work he was to have the right and privilege to use the whole issue of the bonds of the said the Mississippi Valley Transit Company, being five hundred bonds of $1,000 each and now in the hands of the Park National Bank, being the same bonds in controversy in this case, and to pledge the same in their entirety for the purpose of enabling him to raise the money and to procure the labor and materials with which to carry out and complete the work under his contract. That these bonds were secured by the Mississippi Valley Transit Company upon all its rights, privileges and franchises and properties which it owned

at the time of the execution of said mortgage or which should thereafter be acquired by it, and the mortgage was recorded and was and still is a first lien upon all of said property in favor of the holders of said bonds. That in and by the terms of the contract the whole cost of the work so undertaken and performed thereunder, together with said 15% thereof, should be evidenced by the six-months note of the said the Inter-Urban Construction Company, payable and delivered to the said Walter Alexander and the payment thereof should be secured by a deposit with the pledge of all of said bonds. That the Mississippi Valley Transit Company had full knowledge of the contract and its contents between Alexander and the Inter-Urban Construction Company, and consented and agreed to all the terms and conditions of the same. That at the time of the execution of the contract between the Inter-Urban Construction Company and Walter Alexander and as a part of the same transaction and to enable the said the Mississippi Valley Transit Company to raise the money with which to pay for the construction of and equipment of its railway, the Mississippi Valley Transit Company entered into a contract in writing with Woodruff & Williams, a partnership doing business in Cleveland, which contract was also dated the 1st day of February, 1901. That, by the terms of this contract it was agreed that not later than thirty days before the maturity of the note which was to be given by the Inter-Urban Construction Company to Walter Alexander and secured by the pledge of said five hundred bonds as provided in said contract first-named, said Woodruff & Williams should procure for the said the Mississippi Valley Transit Company a note and loan of $300,000 due in six months, from date, bearing interest at six per cent. and to be also secured by a pledge of all of said five hundred bonds. That upon the consummation of said loan the said Woodruff & Williams should receive from the said the Mississippi Valley Transit Company $100,000 par value of the paid-up stock of the said the Mississippi Valley Transit Company and $12,500 in cash, and further, that said Woodruff & Williams should have, for fourteen months from the completion of said railway, an option to purchase all of said five hundred bonds at the rate of 85 cents on the dollar of their

face value, and if they should under said option purchase the same at that rate, they should have the further sum of $12,500 to be deducted from the purchase price thereof. That if the Mississippi Valley Transit Company should, within the said 14 months, pay to the said Woodruff & Williams the sum of $12,500, the said Woodruff & Williams should thereupon release and cancel said option, provided that at the time of such payment to them they had not already sold or contracted to sell said bonds. That the Inter-Urban Construction Company assented and agreed to all the terms, conditions and stipulations of the contract between the Mississippi Valley Transit Company and Woodruff & Williams. That shortly after the making of these contracts Walter Alexander applied to plaintiff to have plaintiff assist him in raising the necessary money and the means with which to carry out his contract with the Inter-Urban Construction Company; and it was shortly afterwards mutually agreed between the said Walter Alexander and this plaintiff that this plaintiff would, by endorsing the notes of the said Alexander and by guaranteeing the full performance of contracts by said Alexander for the purchase by him of materials to be used in the construction and equipment of said railway and by procuring others to so endorse and guarantee such contracts and payments thereby and, in that manner, to assist the said Walter Alexander to raise the money and procure the materials to carry forward the work and construction of his contract with the Inter-Urban Construction Company.

It was further agreed between Walter Alexander and the plaintiff that for such risk and such services so to be performed or secured to be performed by the plaintiff, the said Walter Alexander would pay to the plaintiff a sum equal to one-half of the 15% upon the cost of the construction of said railway, which was to be paid to said Walter Alexander therefor; and it was agreed between them that any sum thus earned or becoming due from the said Walter Alexander and all sums so guaranteed by this plaintiff should be secured to him by a pledge of all of said bonds of the Missississsippi Valley Transit Company until said sums were paid and until plaintiff should be fully relieved from all liability upon, or on account of, said guaranty; and it

was also fully agreed between them that for any and all moneys actually advanced and paid by plaintiff to or on account of the said Walter Alexander for said work or to be used in carrying the same forward, the plaintiff should have 10% on all such payments or advances paid by him and that the same should also be secured to him by the pledge of all of said bonds as aforesaid. That at the time of making said agreement between him and Walter Alexander, the Mississippi Valley Transit Company and the Inter-Urban Company had knowledge of the same and they consented and agreed to the same. That at the time of making the last named contract between plaintiff and Walter Alexander and as a part of the same transaction and as a further inducement thereto, the said Woodruff & Williams also entered into a contract with plaintiff whereby it was agreed between them that plaintiff would assist Woodruff & Williams in negotiating and raising the loan of $300,000 and Woodruff & Williams agreed that for such services and assistance to be rendered by plaintiff, they would pay to him a sum equal to one-half of the amount that should be paid to them under the said contract between them and the Mississippi Valley Transit Company, less $10,000 of money they had actually expended and, to secure the plaintiff for the amount so agreed to be paid to him, he should have the five hundred bonds pledged to him therefor the same as they were agreed by the Mississippi Valley Transit Company to be pledged to Woodruff & Williams and that the Mississippi Valley Transit Company and the Inter-Urban Construction Company had knowledge of *this* contract and assented to the same. He says that he went forward in fulfillment of his contract with Alexander and endorsed notes for him to the amount of $80,000 to enable him to raise money for said work, and guaranteed the performance by him of a contract by him to purchase rails for said railroad, the cost of which rails would not be far from $25,000 and that Alexander expended in and about the work of carrying out his contract for the construction of said road, about the sum of $100,000.

It then avers the failure of the Mississippi Valley Transit Company. It also avers that neither the Mississippi Valley Transit Company nor the Inter-Urban Construction Company

had paid Alexander for said work or for any part thereof; nor have they given him any note for the same. The petition then sets up that in and about the work of the construction of said railroad by Alexander, he was seriously impeded and embarrassed by the failure of the Mississippi Valley Transit Company to secure and set over to him its right-of-way for said railroad as it had agreed to do and that it never did procure for him the right-of-way to connect said railroad at East St. Louis with the local electric railway in that city, as it had agreed to do. And he avers that such connections were necessary to complete that part of the road from East St. Louis to Collinsville; and he avers that, by such failure, the bonds did not have the value ner the financial market that they would have had had the company performed its duty under the contract. It then sets up that through one, H. W. Sebastian, moneys that were designed and agreed to be used between East St. Louis and Collinsville, were actually expended on that part of the road between Collinsville and Edwardsville, which also tended to diminish the value of the bonds.

It avers that at the time of making these contracts H. W. Sebastian was the vice-president and general manager of the Inter-Urban Construction Company, and that, on February 28th, 1901, he was appointed to be its superintendent of construction of said road, by the Mississippi Valley Transit Company and that, in these two capacities, he had the management and control of the work, and that he assumed to and did act, during all the time that the said Alexander was doing work under his contract, as the sole and exclusive manager of all matters and things pertaining to the work thereunder, for both of said companies, and assumed to dictate and control the use and expenditure of all money of said Alexander in and about the construction and equipment of said road.

Then it sets up a failure, on the part of both of said companies, or either, to obtain the franchise to property which it had agreed to procure, which failure on their part greatly delayed and embarrassed Alexander in carrying out the contract.

The petition further says that the Inter-Urban Construction Company had at a time prior to the Alexander contract, agreed

with the Mississippi Valley Transit Company to build said road and complete the same, and that it did a portion of the work and did not pay for the labor and materials it had bought and used in carrying on the work, and that persons who had furnished work and material under said contract were threatening to file mechanic's liens upon the road for the same and that this hindered and delayed Alexander in carrying on his contract, and diminished the value of the bonds.

The petition sets up that the Mississippi Valley Transit Company and the Inter-Urban Construction Company and the defendants, E. W. Clark, Sabin W. Colton, Jr., Edward W. Clark, Jr., Clarence M. Clark, C. Howard Clark, Jr., J. Milton Colton and Herbert L. Clark, partners doing business under the firm name of E. W. Clark & Company, conspired and confederated together for the purpose of defeating Alexander in the carrying out of his contract, and of depriving Woodruff & Williams and the plaintiff of all benefits and compensation to which they, or any of them, would be entitled upon the completion of said road, and that, in the carrying out of said conspiracy, under mere pretense the contract of Alexander was forfeited and that he was excluded from the completion of the same, and that thereby they undertook to defraud said Alexander and the plaintiff of all they were entitled to receive under said contract; and that, in furtherance of said conspiracy, they undertook to, and did, cancel the contract which Alexander had made with the Pennsylvania Steel Company, a corporation, to purchase from it 700 tons of steel rails which the plaintiff had guaranteed to the amount of $25,000 and that the Alexander contract was entirely canceled as a part of the said conspiracy. That said companies are both insolvent, and have turned over all their business matters to E. W. Clark & Company in furtherance of said plan and conspiracy. That the companies have placed it entirely beyond their power to now entirely fulfill said contract.

It says that if said contracts had not been so illegally terminated, he would have realized not less than $50,000 for his services and compensation in the matter; and he prays for an accounting of what he did and earned under said Alexander contract, and what he did have a right to receive under the same

had it not been unlawfully canceled, and that, for the amount found due him, he may have a lien upon said bonds and that said bonds may be sold by the Park National Bank, as trustee, for the payment of such sum and for the full amount the court shall find due the plaintiff, and he asks that the court may find that the Woodruff & Williams contract was unlawfully canceled and that the plaintiff has been injured and damaged and that the court will award him by reason of his equities in said contract, the amount he has lost thereby, which he asks the court to ascertain and determine, and asks to have the amount found due him on his contract paid from the sale of the bonds.

Walter Alexander was never served in this action.

E. W. Clark & Company answered, without denying that the Inter-Urban Construction Company entered into the contract with Walter Alexander, and that the Mississippi Valley Transit Company entered into the contract with Woodruff & Williams.

They deny all the other allegations in the petition set out.

The Mississippi Valley Transit Company answered, adopting largely the averments of the Inter-Urban Construction Company; so that the defenses of the two companies are substantially the same, the difference in their pleadings consisting mainly of the cross-petition of the Inter-Urban Construction Company.

The Inter-Urban Construction Company, in its defense, says it admits that it is a corporation duly organized under and by virtue of the laws of the state of Missouri. It admits that the said Park National Bank is a corporation duly organized under the laws of the United States; that it has an office in Cleveland, Ohio. Admits that Walter Alexander is a non-resident of the state of Ohio. Admits that on the dates mentioned in plaintiff's petition as dates of execution and delivery of the notes described in the plaintiff's petition, five hundred bonds of the Mississippi Valley Transit Company, of the par value of $1,000 each, mentioned in plaintiff's petition, were in the custody of the defendant, the Park National Bank, and are still in its custody; and admits that it has an interest in all of said bonds mentioned in plaintiff's petition. And, furthering answering, denies each and all and singular the statements and allegations set forth in plaintiff's petition.

For its second defense, it first sets up the contract that it made with the Mississippi Valley Transit Company, a corporation organized under the laws of the state of Illinois, by which it agreed to construct and equip and complete, ready for operation, for the said Mississippi Valley Transit Company, an electric railway commencing at a point in East St. Louis in the state of Illinois and terminating in the city of Edwardsville in the state of Illinois, and sets out the substance of the contract, and says that before work was commenced under said contract, there was to be deposited by the Mississippi Valley Transit Company said five hundred bonds with some trust company, upon such terms and conditions as might thereafter be agreed upon by the parties and, in carrying out said provision, the bonds were deposited with the American Trust Company of Cleveland, Ohio, and that the bonds are the same as those referred to in the petition. It says that it entered upon the construction of said railway and, after performing a part of the work, it entered into the contract with Walter Alexander, and the substance of that contract is set forth, and says that said contract required the said work to be completed not later than June 1, 1901, unless prevented by certain things set forth in the contract.

It says that Alexander had no authority to pledge the bonds, or any of them, for any other purpose or purposes whatever than for work and material in the construction of said road, and that the notes held by the plaintiff and set up in the original petition, were given by Alexander to the plaintiff or to W. J. Hayes & Sons for commissions due them from Alexander in what they did in and about furnishing of funds to said Alexander and becoming security for him; and it avers that the bonds were not issued nor pledged under the contracts set forth, for any such purpose, and that they could not lawfully be so used nor could they be pledged as security to Hayes for the guaranty of the contract for rails.

It sets out that W. J. Hayes & Sons countermanded and canceled the contract for the rails and that Alexander acquiesced in such cancellation, and that the rails were never made or delivered, and that there is no liability on the part of any one, on such order; and that there is nothing due Hayes & Sons from

Alexander nor from any one else for such guaranty, nor are Hayes & Sons liable to any one upon said contract of guaranty.

For a third defense, it sets out that said bonds were never delivered to W. J. Hayes & Sons as security for any claim they hold against any of the defendants, and that it never agreed to any such hypothecation.

For its fourth defense and cross-petition, it sets out that Woodruff & Williams have no claim or interest in said bonds or any of them. That on about March 4, 1901, Alexander and Woodruff & Williams made, executed and delivered to the firm of W. J. Hayes & Sons their eight certain promissory notes for the sum of $10,000 each, bearing date March 4, 1901, payable to the order of said W. J. Hayes & Sons four months after date, at the Park National Bank of Cleveland, Ohio; that each of said notes contained an agreement of pledge by which said five hundred bonds were to stand as security for the payment of said eight notes, and that the Park National Bank had full power and authority to sell, assign and deliver the whole of the bonds or any part thereof, at public or private sale, upon non-payment of any of said notes or the interest thereon, and, after deducting legal costs and expenses, to apply the residue or proceeds of said sale, to pay pro rata holders of said eight notes; that to secure those eight notes, Alexander deposited with W. J. Hayes & Sons the five hundred bonds before referred to. That upon March 4, 1901, Hayes & Sons endorsed in blank each and all of said eight notes and at the same time delivered the same and the bonds, securing the same to the Park National Bank. And thereupon, the bank discounted the notes, or procured the same to be discounted. That the bank had full knowledge when it received the bonds of all the conditions under which the bonds could be pledged, and had full knowledge that they were pledged for the payment of the eight notes.

That none of the notes were paid at their maturity by Alexander or by Woodruff & Williams or by the said W. J. Hayes & Sons. That they were held by innocent and *bona fide* holders for value. That the holders of the same were about to proceed to sell the bonds in order to satisfy the amount due them, and that thereupon it purchased said notes from the holders and

paid therefor the sum of $80,186,67, and that it is now the legal holder and owner of the notes. And that said eight notes constitute the only sum for which said bonds are pledged, and that, as such owner of the notes, it is entitled to the bonds, and that it may now terminate the trust of the bank and may have the full enjoyment of the bonds.

It further sets up that Alexander has wilfully failed to comply with his contract entered into with it, and that it was compelled to, and has entered upon the work of constructing and completing said railway; that the time for the completion of the same has been extended by the Mississippi Valley Transit Company, and that it has bound itself to complete said road, and that it is necessary that it should have the five hundred bonds to raise money to carry forward the work; and it prays for the bonds.

The facts set forth are so fully shown in the pleadings that any further statement of the same will not at this time be necessary further than to say that the Mississippi Valley Transit Company and Inter-Urban Construction Company are composed largely of the same persons. The former company is organized under the laws of the state of Illinois, and the latter under the laws of Missouri.

The first contract was entered into on August 22, 1900, between the construction company, as I shall hereafter denominate the Inter-Urban Construction Company, and the transit company, as I shall hereafter denominate the Mississippi Valley Transit Company, to construct the road referred to in the pleadings. It is not necessary to state in detail the provisions of this contract. It was for a consideration of $365,000, and that was the compensation for building complete, ready for operation, the railroad commencing at a point in East St. Louis to Edwardsville; and, upon the completion of the railway from a point where said railroad connects with a line of road of the East St. Louis Electric Railroad to the northern limits of Collinsville and along the route of survey of the party of the transit company, $168,000 in cash was to be paid; when the road between Collinsville and Edwardsville was completed, $168,000 more was to be paid.

This contract contemplated and provides that that part of the road between East St. Louis and Collinsville is to be first completed. The contract provides that these bonds to the number of 500 of $1,000 each, were to be deposited by the transit company with some trust company in the United States with such agreements and instructions as may be agreed upon, and such agreements and instructions should become a part of the contract.

The road was to be completed by January 1, 1901. The construction company proceeded with the work, but had not completed any part of the road by the time limited in the contract. There was no clause of forfeiture in the contract if the same was not completed by the designated time; and no cancellation or forfeiture of the contract was made; but this contract was thereafter recognized as existing and continuing when on February 1st, 1901, the construction company entered into the contract with Alexander, and the transit company with Woodruff & Williams, and these contracts were specifically approved by each of the companies.

On February 1, 1901, the construction company entered into the contract with Walter Alexander. *This* contract makes reference to the contract between the two companies in such manner that the company making the contract with Alexander and the other approving the same, must have understood that the contract between them was still in force. Alexander agreed in his contract to take up the work of construction of the railway in accordance with the provision of the contract so entered into between these two companies. Alexander's contract provided:

"Said party of the second part agrees to enter upon said work immediately and complete the construction of said road in accordance with said contract as fast as work can be prosecuted. All the work of construction of said railway is to be completed not later than June 1, 1901, unless prevented by strikes or excessively bad weather and unless on account of delays caused in the change of said machinery and over-head construction, and, should any delay occur on said account, the time for the completion of said work shall be extended not less than a period of time equal to the delay thus caused. In the event of a change in said machinery or over-head construction, such change shall be made within fifteen days from February 8, 1901."

The contract provided that the work done and contracts entered into for the same should be subject to the approval of the engineer and superintendent of the transit company; that is the contract between the two companies; and, under the Alexander contract, it was to be in accordance with the contract between these two companies, and the time was to be modified as set forth above.

Alexander's contract provided further that he was to save the transit company harmless from liens; that he was to pay all bills at the end of each month. But the contract makes no provision for its cancellation in case Alexander fails to comply with these provisions.

Alexander was to furnish all the funds and, to enable him so to do and to complete the work, he was to have the entire issue of the five hundred bonds, and he was to have 15% on the cost of the road as his compensation, and, when the work was completed, the company was to give him a note due in six months at 6% interest for the cost of construction, plus 15%, which note was to be secured by the entire issue of the five hundred bonds.

Strictly construing this contract, it would seem that it was not intended that he should have these bonds until the note just referred to was given to him. Yet the companies both knew that he had not the means to complete the road and that he could not procure them without these bonds and that the bonds would be of but little benefit to him unless he had power to pledge the same. The contract, therefore, provided:

"Said bonds are to be pledged as security for funds and for labor and material in the work under this contract to the said party of the second part or to any person whom he may designate, until said road is completed and accepted by the Mississippi Valley Transit Company, at which time the note of the party of the first part (Inter-Urban Company) to the party of the second part will be executed and delivered; the amount of said note to be the cost of said construction, plus 15% compensation to the party of the second part hereinbefore mentioned. In the event that said Alexander shall fail to pay all sums contracted for by him for funds to pay for labor and material for said work, the Inter-Urban Construction Company have the

right to pay such sum or sums and redeem said bonds from any pledge of same he may have made hereunder.''

And the contract provided that the bonds could only be pledged in their entirety.

The persons who became interested in this contract in the way of carrying it out, or by being parties to it, were Sebastian, who was then the vice-president of the construction company; W. N. Warnick, a vice-president of the transit company; Alexander, and Williams of Woodruff & Williams, and Harry E. Hayes. The contract was modified before signed, at the suggestion of Hayes, but it is unnecessary here to notice the changes that were made, in the view that we take of this case; and, after such change was made, the contract was signed and was thereafter formally approved by resolution of the board of directors of the transit company. At the same time, February 2, 1901, the transit company executed and delivered to Hayes and Alexander a paper as follows:

"St. Louis, February 2, 1901. ''We certify and guarantee that all franchises and rights-of-way have been secured from East St. Louis, Illinois, to Edwardsville by way of Collinsville, except the following, to which the company has not yet secured the right-of-way,'' and the list attached includes Matthews' property, Wm. Craig's property and Louis Craig's property, but does not include the Bowman property. ''We guarantee said rights-of-way will be secured at once and shall not cause delay in the construction of said railway. Some of the railway crossings have not been entirely secured, but are in the condition set forth in the opinion of W. M. Warnock in the possession of Hayes & Company.

"(Signed) C. F. Blancke, President,
"J. F. Conrad, Secretary.''

At the same time that the contract between the construction company and Alexander was signed, the transit company entered into a contract with Woodruff & Williams, which contract provides:

"The parties of the second part (Woodruff & Williams) agree to procure a loan of $300,000 for the party of the first part by a date not later than 30 days prior to the maturity of a certain note this day agreed to be executed by the Inter-Urban

Construction Company to one Walter Alexander; said loan to be procured upon the note of·the party of the first part at one year, six per cent. interest, and to be secured by the entire issue of bonds for the party of the first part."

That contract provided that Woodruff & Williams were to have an option on all the five hundred bonds, at the rate of eighty-five cents on the dollar, for a period of fourteen months from the completion of the road.

2d.   They were to have $100,000 of the stock of the transit company.

3d.   They were to be paid $12,500 in cash.

4th.   If Woodruff & Williams took or sold the bonds at 85 cents· on the dollar, they were to have the additional sum of $12,500 cash to be deducted from the price of said bonds.

5th.   If, before Woodruff & Williams sold the bonds, the Transit Company desired to do so, they had the privilege of cancelling the contract upon the payment to Woodruff & Williams of $37,500.

That contract was to be null and void if Woodruff & Williams failed to procure the loan of $300,000.   Upon that contract, the construction company endorsed this language:

"The Inter-Urban Construction Company, acting by the authority of its board of directors, hereby gives its assent to the above and foregoing agreement.

"(Signed) Inter-Urban Construction Co. ·
"By H. W. SEBASTIAN, *Vice-President,*
"ALBERT G. BLANCKE, *Secretary.*"

About this time, or just subsequent, Sebastian resigned as vice-president of the construction company, and became the superintendent of the transit company, and, thereafter, acted in behalf of both companies in the carrying out of the Alexander contract.

Under these contracts Williams might have negotiated the $300,000 loan from parties entirely outside of any of those named in this action and, with the money obtained on such loan, he could have pledged the five hundred bonds and, with the proceeds, have taken up the eight notes on which the bonds were pledged to the Cleveland bank; but, instead of doing this, he

acted in conjunction with Alexander and took part with Alexander in the negotiations with Hayes with a view to procuring the funds necessary to construct the road. In their negotiations just prior to the pledging of the bonds, they undertook to follow out the arrangement of the two companies, as expressed in their contracts, to first construct and put into operation that part of the road between East St. Louis and Collinsville, and then to proceed to construct the road between Collinsville and Edwardsville. The purpose of this arrangement was to give the bonds more value and a more ready market, as, after the completion of a part of the road they could certainly be better used to obtain the money for the other part.

The money necessary to complete the road from East St. Louis to Collinsville was estimated by all the parties concerned, at about $66,000 or $67,000. A part of the work on this division had already been done before Alexander undertook the work. Having this plan agreed upon as between Williams, Alexander and Hayes, it was arranged that they would proceed to obtain sufficient money to construct the first division. Thereupon Williams agreed with Hayes that if he would endorse the notes of Woodruff & Williams and Alexander for $80,000, they would pay Hayes 5% on $80,000, being a part of the 15% going to Alexander upon the completion of his contract. That proposition or contract, whichever it may be, is found in a letter signed by Woodruff & Williams and Walter Alexander, and addressed to W. J. Hayes & Sons, bankers in the city of Cleveland, and is as follows:

"*Gentlemen:* In consideration of your communication of this date, relating to the guaranty for the sum of eighty thousand ($80,000) dollars for us for the purpose of procuring funds to pay for labor and material to complete the line of the railroad of the Mississippi Valley Transit Co. between East St. Louis and Collinsville in the state of Illinois, and in consideration for said guaranty to be hereafter executed, we hereby agree to guaranty to your firm a sum equal to five per cent. (5%) of the amount so to be guaranteed; payment to be made pro rata as the same is procured on said guarantee.

"In witness whereof we have subscribed our names this the day and year first above written."

What the communication of W. J. Hayes & Sons was, that called forth this letter or proposition, does not appear in the evidence; and, whether this was in answer to a proposition, or merely a proposition in answer to an inquiry, does not clearly appear. The parties, however, thereafter treated it as the contract between them as to the $80,000 borrowed on the eight notes of $10,000 each of the bank and for which the bonds were pledged as collateral.

Williams first attempted to raise the money himself and after being unsuccessful, Hayes undertook to raise the money and it is claimed that his efforts in raising the money was something *outside* of the contract, as this contract or arrangement related only to the guaranty of the paper on which the $80,000 should be raised and, in consideration of Hayes undertaking to do more than this arrangement called for, another paper dated the same day, February 19th, was executed, which communication was directed to H. E. Hayes individually, and that communication reads as follows:

"*Sir*: In consideration of your communication of this date, relating to the guaranty for the sum of $80,000 for us for the purpose of procuring funds to pay for labor and material to complete the line of railroad of the Mississippi Valley Transit Company between East St. Louis and Collinsville in the State of Illinois, and in consideration of said guaranty to be hereinafter executed, we hereby agree to pay you a sum equal to two and one-half per cent (2½%) of the amount so to be guaranteed; payment to be made *pro rata* as the same is secured on said guaranty. We also agree to pay you a further sum of seven and one-half per cent. (7½%) on all sums above $80,000 on which we receive 15% provided for in a certain contract between the Inter-Urban Construction Company of St. Louis, Missouri, and Walter Alexander, bearing date of February 2, 1901.

"For a less sum than 15% on sums over $80,000 commission to be reduced proportionately.

"In witness whereof we have subscribed our names this day and year first above written."

What called for *this* communication, we do not know. It may have been the accepting of a proposition made by Harry E. Hayes, or it may have been in answer to an inquiry on the part

of Harry E. Hays as to what Woodruff & Williams and Walter Alexander would do if Hayes guaranteed more than the $80,000.

There is no evidence in the case that Hayes accepted this proposition, or ever assented to the same, except as he did go forward and furnish the $80,000 and beyond that he did guaranty the payment of $25,000 for the steel rails. But we find nothing in this to warrant us in saying that this proposition was made, or that it was an acceptance of a proposition made by Harry E. Hayes for a consideration to be paid to Hayes for himself procuring money. On the contrary, the terms are plain that it was simply for a guaranty.

At the same time, though dated February 20, 1901, Woodruff & Williams sent to H. E. Hayes the following communication:

"*Dear Sir*: In consideration of your co-operation with us in the matter of placing a loan of $300,000 on the bonds of the Mississippi Valley Transit Company, as provided in a certain contract between Woodruff & Williams and the Mississippi Valley Transit Company, dated February 1st, 1901, a copy of which contract is hereto attached, we propose as follows:

"After deducting the sum of $10,000 to re-imburse us for previous expenditures in connection with the transactions with the Mississippi Valley Transit Company which have culminated in the contract above-mentioned, we will share equally in the net commission providing for compensation for placing of said loan of $300,000 and share equally in the net profits that may accrue from the sale of the bonds described in said contract."

It does not appear from the evidence whether this was a mere proposition on the part of Woodruff & Williams to H. E. Hayes, or whether it was an acceptance of a proposition made by Hayes to them, nor does it appear, if it was a proposition, that it was ever accepted and acted upon by H. E. Hayes. There is no evidence that Hayes ever did anything in the matter of placing a loan of $300,000 on these bonds or ever agreed to do anything except that Williams was operating in conjunction with Alexander to aid Alexander in raising the money for the construction of the road, and did, while so operating, aid in securing for Alexander the $80,000 referred to. The evidence does not show that the $80,000 was ever to be, or was considered, a part of this $300,000 to be raised by Woodruff & Williams only as they co-

operated with Alexander in raising the $80,000 and, as the evi-
dence reveals Woodruff & Williams were, on terms agreed upon
between them and Alexander, undertaking to help Alexander to
raise the money necessary for the construction of the road, and
joined him in these communications pertaining to the $80,000
and additional money to be raised in his communication to
Hayes. But this does not establish conclusively in this case that
the $80,000 was to be regarded as a part of the $300,000. $68,-
000 might have been raised under the Alexander contract and
enough more raised to complete the road by the benefit of the
Hayes' guaranty; and yet, after that was done, Woodruff & Wil-
liams, through the aid of Hayes, might have raised the $300,000
and with it taken up all the money raised for the construction
of the road and pledged the bonds for the same.

The $80,000 was raised in the same manner as set forth in
the pleadings in the case, and the 500 bonds of the Transit Com-
pany pledged as collateral.

Hayes, in procuring the $80,000, did more than simply to
guarantee the paper. He saw the Park National Bank and
helped to negotiate the loan.

The plan arranged between these three parties was to use this
money, or so much of it as was realized over and above commis-
sions to the Bank as Trustee, and to Hayes, upon the first divi-
sion of the road. And there was realized out of the $80,000
approximately $71,000, which was in excess of the amount esti-
mated necessary to complete the first division.

March 4th, 1901, Sebastian, who was acting as we find, for the
construction company and the transit company, appeared in
Cleveland with the bonds which he was to either pledge for the
money raised or to turn over to Alexander and have Alexander
pledge the same; and Sebastian delivered to Hayes these 500
bonds and took from Hayes a receipt which had been prepared
by the president of the Construction Company prior to Sebas-
tian's departure from St. Louis for Cleveland. Much stress is
laid upon this receipt but the point raised as to the same is a
matter of no concern in the consideration we give this case.

It is claimed, however, that Hayes by signing the receipt, con-
sented that all the money raised on the pledge of the bonds as

collateral, should be used in the payment of labor and for materials, and that no part of it could be used for the payment of commissions either to Alexander, Williams or Hayes. But as to the commissions that were taken out of this $80,000 we have nothing to do, in the view we take of this case—of which I shall speak more at length hereafter.

Upon this receipt being signed, the bonds were turned over to Hayes and Williams and they carried them to the Park National Bank and it received then under the trust agreement attached to the eight notes for $10,000 each, and thereupon opened an account in the name of Walter Alexander, trustee, crediting him with the proceeds of the discounts of the notes, $80,000 less 7 per cent. interest and $1,000 *bonus*—this *bonus* going to the bank for acting as trustee in making the loan and holding the bonds—making the net credit then entered to Walter Alexander's account $77,070.67, and the bank gave him a pass-book in which this credit was entered, and thereupon Hayes and Williams returned to where they had left Sebastian and told him what had been done and showed him the credit entered in the bank book. On the same day Walter Alexander drew his checks: one for $4,-000, being 5% of $80,000, and one for $2,000, being 2½% on $80,000—making a total of 7½% on $80,000, to the credit of Hayes, and these checks were paid.

And it was there arranged and agreed that checks of Walter Alexander on this fund should be drawn by him, signed ''Walter Alexander, Trustee,'' counter-signed by W. J. Hayes & Sons and Sherwin, in order that the purpose for which the fund was to be devoted, to-wit, the construction of the line between East St. Louis and Collinsville, should be carried out and that no part of the pledge should be otherwise used.

This arrangement was made between Hayes, Williams and Alexander. It does not appear from the evidence that Sebastion, when he was in Cleveland on March 4th, knew of this arrangement. As he was told all else that was done on that occasion, it is most likely that this arrangement was then communicated to him. The Park National Bank and Hayes would hardly enter into an arrangement of that kind unless it was agreeable to the companies at St. Louis, which were represented by Sebas-

tian. The evidence, we think, shows that this arrangement was, at least later, communicated to and acquiesced in, by Sebastian as well as other officers of both companies, and that the proceeds of the $80,000 used in the construction of the road was used with the acquiescence of the companies at St. Louis in the arrangement made that the money should be used on the first division. To carry out this arrangement, certain requisitions were to be made, all of which were thereafter made in the same form, which amounted to an order from Walter Alexander to the Park National Bank and W. J. Hayes & Sons directing them to pay H. W. Sebastian a certain sum of money named to be used to pay for labor and material to be used in the completion of that section of the electric road of the transit company between East St. Louis and Collinsville in the state of Illinois, and not otherwise.

These orders or requisitions were signed by Alexander, and counter-signed by Williams, and upon the one in evidence—and the evidence shows they are all alike—H. W. Sebastian endorsed the following:

"This certifies that the sum of $10,000 mentioned in the above requisitions will be used to pay for labor and material in the completion of that section of the electric road of the Mississippi Valley Transit Company between East St. Louis and Collinsville, and not otherwise."

A similar requisition, signed by Sebastian and Walter Alexander, is attached to a certain contract for purchasing the iron for the road between East St. Louis and Collinsville. And, in our judgment, the evidence is conclusive that these companies both knew of the arrangement to have the money raised and here in Cleveland applied on the first division of the road, and that they had fully consented that the same be thus applied.

Some question arose as to where the $15,000 should be used, and Hayes communicated with Sebastian and insisted that it be applied on the first division and Sebastian acquiesced in the request of Hayes, evidently recognizing the fact that that arrangement was assented to by his companies. During the time that work was progressing on this first division, on the 29th day of April, 1901, Hayes wrote to Sebastian that he and Alexander might proceed to make a contract for steel and other materials to

complete the road to Edwardsville, and wrote to him to refer the contract to him of "to us for guaranty and approval."

Thereupon Sebastian and Alexander proceeded to contract for 700 tons of iron with the Pennsylvania Steel Company, which contract was dated May 11th, 1901, and it provided that it should be guaranteed by Hayes on May 20th after the execution by Alexander of the notes guaranteeing Hayes against loss to the amount of the contract and evidencing his commission.

These two notes, thus issued to Hayes at the time of the making of that contract, are the ones set up in the original petition.

And for the rest of the material needed on the second division of the road, Sebastian, at least in part, contracted and did not ask Hayes to guarantee *these* contracts but guaranteed them himself, and he says that he did not deem it necessary under their arrangement to send these contracts to Hayes. But, upon reading Sebastian's evidence, we are at a loss to know *why* he should take upon himself financial responsibilities which he had a right to have assumed by Hayes. However, this matter is not very material except as we think it relates to what took place thereafter.

To pay for these materials contracted for and which, under the arrangement made, should have been sent to Hayes for his guaranty but which were guaranteed by Sebastian, moneys sent out to St. Louis to be used for the payment of labor and material on the first division were by Sebastian applied without the consent of Alexander, Hayes or Williams to the payment of claims arising entirely upon the second division. And here much of the trouble between these parties commenced. From this time forward Sebastian claimed that he had a right to direct the use of the moneys sent there out of the $80,000, to any part of the entire road, and claimed that he had never consented to any other arrangement.

This grew out of circumstances which, it seems to us, made it almost imperative upon Mr. Sebastian that he should change his base somewhat in regard to this matter. The company was about to lose certain franchises on that part of the road between Collinsville and Edwardsville. Evidently, having no money of its own with which to secure these franchises, it used the money sent there from Cleveland under this arrangement between Alex-

ander, Williams and Hayes and acquiesced in by Sebastian, if not agreed to. This, under the arrangement, the St. Louis companies had no right to do. It was at least an act of bad faith of such a nature that their previous conduct would have estopped them from doing it; and we feel warranted in saying that, under all the circumstances, it was a violation of what would amount to an implied contract obligation.

Immediately following this transaction, Sebastian commenced to find fault with Alexander; that he was not meeting his obligations as he was obliged to do under his contract, and that certain liens were about to be filed upon the road and that he was violating his contract in not having the road completed and that he was not furnishing money. Thereupon he called together his company and had Alexander's contract forfeited, and this, too, while a portion of the right-of-way between East St. Louis and Collinsville had not yet been procured by the transit company. He called for Alexander to produce some $7,000 and, because it was not produced on exceedingly short notice, this action was taken of forfeiting his contract.

Just prior to this forfeiture of Alexander's contract, the officers of the transit company were approached by parties who desired to buy the entire right and interest of the transit company in the road; and this matter was being somewhat considered at this very time, if not by the company itself, yet by certain individuals who were anxious to bring about a transfer of the road to another company; and we have no doubt from this entire evidence, that this was the beginning or, perhaps, the second step in the action of Sebastian in undertaking to transfer the funds intended for the first division to secure franchises on the second division; and this was followed up by the cancellation of the contract, no doubt, in view of accomplishing a transfer of the road.

We believe from the evidence, and so find, that Alexander was hindered and delayed in the carrying out of his contract by the failure of the company to obtain franchises and right-of-way over certain parts of the road in and near East St. Louis. Had these been obtained, as contemplated by the contract with Alexander and as Alexander was led to believe they would have been obtained, then it would have been much easier to obtain loans.

One uncertainty in regard to the investment of funds in the road would have been done away with; and, if the right-of-way had been obtained, unquestionably Alexander would have had his road in operation between East St. Louis and Collinsville substantially as contemplated by the contract.

But a determination of the legal rights of Hayes in this action centers within a very few of the facts that we find to exist in this case, although they *all* bear somewhat upon the arrangement he had. His rights are to be determined by considering what arrangements and contracts were entered into between him and Woodruff & Williams and Walter Alexander. As has already been said, the communication of Woodruff & Williams and Walter Alexander on February 19, 1901, to W. J. Hayes & Sons, and also the one of the same date to H. E. Hayes, form the basis of any claim that the plaintiff has in this case. As has already been said herein, the court is unable to say whether these propositions form the basis of a contract or not; the second and third, in the order in which they have been taken, may amount to nothing more than propositions never accepted by Hayes. It nowhere appears in this case that they do amount to contracts. And, under such state of facts, we are inclined to take no stronger ground upon these communications than is taken by the counsel for plaintiff. Counsel say:

"Properly construed, these contracts obligated Hayes to guarantee $80,000 and aid Woodruff & Williams in procuring that sum. That the contracts did not obligate Hayes to furnish *all* the money necessary to complete the entire road, notwithstanding which we contend that Hayes was in position, actually stood ready, and was able and willing to procure the necessary funds to complete the road in its entirety along the lines and on the plan which all the parties at all time had in contemplation."

It is a little indefinite just what counsel means by saying that "Hayes was not obligated to furnish *all* the money necessary to complete the entire road." I suppose that claim is based upon the second communication, of February 19th, wherein it is said: "On all sums above $80,000 on which we receive 15 per cent.," etc., contemplating that he *might* furnish any amount above the $80,000 as may be claimed, or that he might guarantee, whatever

amount it might be, whether the whole or a part of the amount needed to complete the road, he should receive the commissions of one-half of the 15 per cent. on the amount guaranteed.

In another place in the brief of counsel for plaintiff it is said:

"The two contracts of February 19th and the one of February 20th with W. J. Hayes & Sons and Harry E. Hayes, construed together, as we have indicated in the foregoing statement, obligated Hayes simply to guarantee $80,000. This was his entire obligation and, having performed this obligation, he thereby became entitled to 7½% of any compensation or damages that Alexander would be entitled to receive, one-half of whatever Woodruff & Williams were entitled to receive after deducting $10,000. The agreement by Hayes to guarantee the $80,000 which he subsequently did, furnished the consideration for all that was provided in the contract for him to receive. The contract provided that for this guarantee, he was to receive 7½% on the $80,000, and also 7½% on all sums above $80,000. And it is quite unnecessary that he should have parted with any other consideration than the guarantee of the $80,000 in order to be entitled to receive therefor, to-wit, two things: 1st. 7½% on $80,000, and, 2d. 7½% on all sums above $80,000 going to Alexander. The only consideration for guaranteeing the $80,000, which he did, was sufficient consideration to support the entire contract."

We can not agree with *this* claim. If it is true that Hayes had no obligation except to guarantee the $80,000, then by contract relation made by these communications, he had no other obligation. And it is not claimed that there is any other contract or any other arrangement.

If he had refused to furnish or guarantee *after* the $80,000, none of the parties in this action could have had any claim against him for breach of contract. If Alexander and Williams had gone to other parties and raised the money necessary to complete the road, above $80,000, and he had got his commissions as he did on the $80,000, he would have had no claim against them for any breach of contract. If there was no contract beyond the $80,000, then merely guaranteeing the steel contract would not be under the contracts in contemplation, and if that was an acceptance on behalf of Hayes of the proposition of Alexander and the proposition of Woodruff & Williams to furnish money beyond the $80,000, it could not be construed into an

acceptance of any amount beyond the steel contract, and this seems to be the construction put upon the contract by the attorneys of plaintiff, for they say that these communications place no obligations upon Hayes beyond the $80,000; that he was under no obligations to contribute the entire sum, even if he contributed $5,000 or any other partial amount. We agree with this claim. And hence if he did guarantee the steel contract, he was obligated no further than that. Being obligated no further, he could get no commissions beyond that from Alexander and Williams. Not being entitled to any commissions beyond that from Alexander and Williams, he would not be entitled to recover from the defendants in this action. But as to the steel contract, that was canceled with his approval. His approval would be a waiver of any commissions he was entitled to. He can never be liable upon that guaranty to any one and, having allowed it to be canceled with his consent, he has waived any commissions that he would be entitled to on account of that guaranty.

In our minds, the case then stands this way: For the $80,-000 Hayes got his commissions. For the $25,000 steel contract guaranteed by him, he is entitled to no commissions. Further than that, he has never accepted any contract; simply being ready and willing to accept, we think would not entitle him to commissions or damages, although prevented from so doing by the circumvention of the St. Louis companies, as long as he had not indicated to either Williams or Alexander or to the construction company or to the transit company his readiness and willingness to furnish additional moneys for the completion of this road. Had he communicated to Sebastian at the time he wrote to him to go ahead and make contract for the second division of the road, that he was now under an arrangement with Alexander and Williams going on to guarantee all contracts necessary for a full completion of the road, so that he would have known when he forfeited Alexander's contract, of Hayes' full connection with the Alexander contract, then the proposition quoted from the brief might be good law. But Sebastian had no notice—could have had none—of Hayes' intention to guarantee additional amounts beyond what he had guaranteed,

for no such arrangement existed. He had never accepted these propositions of February 19th and 20th beyond the $80,000 and beyond the guaranteeing of the steel contract. And if he had any intention to do anything more, he had never communicated it to any one; and, as to any additional amount, the contracts could never take effect until he had done something by way of complying with the terms, and even then the contract, according to his own construction, would be accepted by him only so far as what he then did.

It is the opinion of the court that the plaintiff had no contract arrangement with Alexander and Williams that would place the construction company and the transit company under any obligations to consider *his* relation to the road in cancelling Alexander's contract.

The most favorable light in which the plaintiff can be placed in this case, in our judgment, is, that he has no claim for any commissions on the $80,000. He has already received his commissions for that amount. Hence it is not necessary for him to retain the bonds as security for those commissions.

As to the guaranty he made for the steel rails—he has no claim; he assented to the cancellation of that contract; he is no longer bound by the same.

As to any further commissions, he has no contract relations for any. He did nothing that would imply an obligation to pay; and hence he has no right to have the bonds retained in the hands of the bank, as he has no claim and can have none in this case under the testimony and the law, which will entitle him to have the bank hold them as collateral for him.

Wherefore his petition is dismissed at his cost.